IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LAVISE MAE JOHNSON,                )
                                   )
                   Plaintiff,      )
                                   )
         v.                        )        C.A. No. 18-1753 (MN)
                                   )
ANDREW M. SAUL, Commissioner of    )
Social Security Administration,    )
                                   )
                   Defendant.      )

## MEMORANDUM OPINION

Lavise Mae Johnson, Wilmington, Delaware; Pro Se Plaintiff.

Eric P. Kressman, Regional Counsel, and Stuart Weiss, Assistant Regional Counsel, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania; David C. Weiss, United States Attorney for the District of Delaware, Wilmington, Delaware; Gregg W. Marsano, Special Assistant United States Attorney, and Heather Benderson, Special Assistant United States Attorney, Office of the General Counsel, Philadelphia, Pennsylvania, Attorneys for Defendant.

March 18, 2020
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Plaintiff Lavise Mae Johnson ("Johnson" or "Plaintiff"), who appears *pro se*, appeals the decision of Defendant Andrew M. Saul, Commissioner of Social Security ("the Commissioner" or "Defendant"), denying her applications for Social Security disability insurance benefits ("DIB") under Title II of the Social Security Act and supplemental security income ("SSI") benefits under Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 401-434, 1381-1383f. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Pending before the Court are Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment. (D.I. 20, 21). Plaintiff asks the Court to find that she qualifies for Social Security disability. (D.I. 20 at 1). The Commissioner requests that the Court affirm the decision denying Plaintiff's claim for benefits. (D.I. 22 at 25). For the reasons stated below, the Court will remand the matter for further proceedings.

## I. BACKGROUND

### A. Procedural History

On May 28, 2014, Plaintiff filed for DIB and SSI, alleging disability beginning September 20, 2012 due to lower back pain, entire left leg pain, left ankle pain, and migraine headaches. (D.I. 10-2 at 16; 10-3 at 4; 10-5 at 2-14; 10-6 at 6-12). Plaintiff's application was denied initially on February 17, 2015, and following administrative hearings before an Administrative Law Judge ("ALJ") on July 7 and September 15, 2017. (D.I. 10-2 at 38-71; 10-3 at 1-19). Plaintiff, who was not represented by counsel, provided testimony as did vocational expert ("VE") Aleta Coles. The ALJ issued a decision on November 7, 2017, finding that Plaintiff was not disabled. (D.I. 10-2 at 16-31). Plaintiff sought review by the Appeals Council, submitted additional evidence, and her request was denied on October 10, 2018, making the ALJ's

decision the final decision of the Commissioner.  (D.I. 10-2 at 2-12).  On November 7, 2018, Plaintiff, appearing *pro se*, filed this action seeking review of the final decision.  (D.I. 2).

### B. Factual History

#### 1. Disability Report (Form SSA-3368)

In her disability report dated October 18, 2014 (Form SSA-3368) (D.I. 10-6 at 11-18), Plaintiff asserted that she has the following physical or mental conditions that limit her ability to work: lower back pain, entire left leg pain, left ankle pain, and migraine headaches.  (*Id.* at 12). She indicates that she stopped working on January 9, 2011, because of her conditions.  (*Id.*).  She lists the following pain medications on her disability report: Chlorhexidine Gluconate, Docusate Sodium, Ferrous Sulfate, Ibuprofen, Naproxen EC, Naproxen, Oxycodone, Sumatriptan Nasal Spray, Sumatriptan, Tramadol Hcl, and Tylenol #3.  (*Id.* at 15).  Plaintiff lists the following providers as having medical records about her physical and mental conditions:  Brownsville Multi-Services Family Health Center ("Brownsville") and Arlene Richards, PA ("Richards") at the Brookdale Medical Hospital Center ("Brookdale").  (*Id.* at 16).

#### 2. Disability Report – Appeal (Form SSA-3441)

In her May 23, 2015 appeal disability report (D.I. 10-6 at 41-48), Plaintiff indicates a change in her condition with no new physical or mental limitations.  (*Id.* at 42).  The medical providers listed are Dr. Rafael Ilyayev ("Dr. Ilyayev") of Interfaith Medical Center, Barbara Auxais ("Auxais"), FNP-BC, of Brownsville;  and P.A. Arlene Richards ("Richards") of Brookdale.  (*Id.* at 43-45).  Medications listed are: Sumatriptan Nasal Aerosol; Therapeutic Vit-Tab; aspirin; Docusate Sodium; Naproxen; Ferrous Sulfate; and Tramadol-Hydrochloride.  (*Id.* at 46).

### 3. Recent Medical Treatment (Form HA-1631)

In her April 4, 2016 recent medical treatment form Plaintiff stated that in February 2016 she had received treatment at Connections CSP ("Connections") for bipolar disorder, manic depressive episodes, mood swings, and not sleeping well. (D.I. 10-6 at 65). She was prescribed Mirtazapine to help her sleep, Risperidone for bipolar disorder, and Lamotrigine for anxiety. (*Id.* at 63).

### 4. Medical History, Treatment, and Conditions

#### a. Physical Conditions, Providers, and Treatment[1]

On February 27, 2013, Plaintiff presented to Brownsville with several complaints, including headaches. (D.I. 10-7 at 14). She indicated that over-the-counter medicine and aspirin relieved her headaches. (*Id.* at 14-15). Plaintiff was told that MRI results showed microvascular changes to the brain similar to those seen with migraines and she was prescribed Naproxen and Imitrex nasal spray. (*Id.* at 14-15).

On May 9, 2013, Plaintiff presented to Brownville and reported low back pain. (*Id.* at 20). Plaintiff relayed that that she was "unable to do full time work [and] want[ed] a letter to social services." (*Id.*). Plaintiff's musculoskeletal, extremity, neurological, and psychiatric exams were normal. (*Id.* at 21). Her medications were adjusted, and she was prescribed physical therapy. (*Id.* at 22).

On August 2, 2013, Plaintiff returned to Brownsville for a medication refill. (*Id.* at 27). Plaintiff had pain in the lower back she described as an ache, deep, diffuse, and dull, with no radiation. (*Id.*). Her symptoms were aggravated by daily activities such as lifting, standing, and walking. (*Id.*). She had been referred to physical therapy but had not yet been to an appointment.

---

[1]     The record does not contain medical evidence for the year 2012.

(*Id*.).   Plaintiff indicated that she needed a letter with her medical problems and why she cannot work.   (*Id*.).   Examination of the lumbar spine revealed tenderness and a mildly reduced range of motion.   (*Id.* at 28).   The assessment was chronic back pain, Plaintiff had an appointment for physical therapy in two weeks, and she was advised to lose weight.   (*Id*.).

Plaintiff received physical therapy on four occasions between September 17 and October 23, 2013.   (*Id.* at 40).   On October 25, 2013, Plaintiff returned to Brownsville complaining of ankle pain after she tripped and fell in a store the prior day.   (*Id.* at 42). Examination indicated a normal gait, no psychiatric symptoms, and left ankle swelling and moderate pain with motion.   (*Id.* at 43).   Plaintiff was referred to the emergency room.   (*Id.* at 3, 9, 43).   X-rays were taken and there was no fracture.   (*Id.* at 3).   Plaintiff was assessed with ankle pain/strain and discharged with pain medication.   (*Id.* at 11).

On February 28, 2014, Plaintiff presented to Brownsville for medication refills and complaints of back pain traveling to her legs and hips.   (*Id.* at 48).   Plaintiff stated that she had difficulty standing from the lying position.   (*Id*.).   The lumbar spine was tender and Plaintiff had "moderate" pain with motion.   (*Id.* at 49).   Plaintiff was referred to radiology for diagnostic testing.   (*Id*.).   On April 2, 2014, Plaintiff returned to Brownsville and asked for a physical therapy referral.   (*Id.* at 53).   She attended two sessions between May 30 and August 19, 2014. (*Id.* at 62).

X-rays taken of Plaintiff's lumbosacral spine on June 19, 2014 revealed disc disease at L5-S1, grade 1 anterolisthesis of L4 in relation to L5, and levoscoliosis.   (*Id.* at 71).   On September 13, 2014, Plaintiff returned to Brownsville for medication refills and completion of disability forms.   (*Id.* at 65).   Plaintiff had back and joint pain and was referred to pain management.   (*Id.* at 66-67).

On January 1, 2015, Plaintiff presented to the emergency room with right hand pain. (D.I. 10-8 at 16, 18). She was in no apparent distress and her mood and affect were normal. (*Id*. at 17). Radiographs of Plaintiff's right hand, forearm, and wrist were unremarkable. (*Id.* at 14, 15). Plaintiff had right hand/wrist and forearm tenderness, mild edema, and discomfort with range of motion. (*Id.* at 17). She was given pain medication and discharged. (*Id.* at 18). On March 20, 2015, Plaintiff presented to Brownsville with multiple complaints. (D.I. 10-7 at 83). A brain CT scan taken April 7, 2015 was negative. (D.I. 10-8 at 49).

On October 15, 2015, Plaintiff presented to Westside Family Healthcare ("Westside") with reports of chronic back pain. (*Id*. at 77). Plaintiff was prescribed pain medication and physical therapy was recommended. (*Id*. at 77-78). A December 23, 2015 right wrist x-ray was unremarkable. (D.I. 10-9 at 95). April 18, 2016 lumbar spine x-rays revealed no fracture or subluxation although there were degenerative changes. (D.I. 10-8 at 63). On November 4, 2016, Plaintiff presented to the emergency room for right leg swelling. (D.I. 10-9 at 93). A Doppler ultrasound was performed the next day with unremarkable results. (*Id*. at 94).

On January 9, 2017, Plaintiff presented to the emergency room with left leg pain and was prescribed Percocet. (*Id*. at 88). On March 13, 2017, Plaintiff was seen by James E. Downing, M.D. ("Dr. Downing"), a pain management specialist, and reported one to two years of gradually worsening back pain with very rare radiation to the left lower extremity. (D.I. 10-10 at 5). Plaintiff stated that her symptoms worsened with all forms of activity, and she described the pain as constant, burning, throbbing, and aching. (*Id*.). Plaintiff indicated that physical therapy and medication were not effective. (*Id*) Upon examination, Plaintiff had normal motor strength and coordination, was in no acute distress and used no assistive device, though she had antalgic gait. (*Id*.). She displayed antalgic posture arising from a seated position and had decreased

mobility/flexibility of the lumbar spine on flexion and extension. (*Id*.). The lumbosacral region was moderately tender to firm palpation and straight leg maneuver was equivocal bilaterally. (*Id*.). Dr. Downing administered lumbar facet joint injections. (*Id.* at 6).

Plaintiff returned to Dr. Downing on May 15, 2017 with continued pain. (*Id*. at 8). She ambulated with coordinated gait, 5/5 strength in the lower extremities, and had tenderness to palpation. (*Id*.). Plaintiff was offered a physical therapy prescription but she declined. (*Id*.).

On June 25, 2017, Plaintiff was seen at the emergency room for a right hand fracture. (D.I. 10-9 at 78-79). A July 6, 2017 MRI of the lumbar spine revealed multilevel disc bulges and spondylolisthesis as well as annual fissuring and neuroforaminal stenosis; prominent facet synovial cysts at L4-L5 bilaterally with mild edema; and diffusely low marrow signal with a myelophthisic (chronic anemia, smoking) or myeloproliferative process. (*Id*. at 74-75).

On July 24, 2017, Plaintiff returned to Dr. Downing with left lower radicular symptoms, she continued to ambulate with coordinated gait and 5/5 strength in the lower extremities, and had tenderness to palpation. (D.I. 10-10 at 9). Dr. Downing declined Plaintiff's request to refill pain medication and scheduled her for nerve block injections. (*Id*. at 10). Plaintiff returned to Dr. Downing for pain management treatment including pain relief injections in August and September 2017. (*Id*. at 11-12). Plaintiff presented to the emergency room with low back pain on September 14, 2017. (*Id*. at 13). The day before, she had presented to the emergency room with a fracture of her right hand fifth metacarpal bone. (D.I. 10-9 at 106).

### b.      Mental Conditions, Providers, and Treatment

When Plaintiff was seen by Dr. Downing on March 2016 for pain management, he made mention that Plaintiff's medical history was notable for psychiatric disease under ongoing psychiatric care. (D.I. 10-10 at 5). On February 12, 2016, Plaintiff presented to Connections

CSP ("Connections") for intake for mental health services. (D.I. 10-9 at 42). She reported many psychiatric symptoms including auditory hallucinations, but denied suicidal or homicidal ideation, stated that she had not been on any psychiatric medications, and indicated she could take care of her activities of daily living independently including handling her own finance. (*Id.* at 53-58).

Plaintiff was seen by therapist Kathryn Nevin ("Nevin") for therapy on February 12, 2016, and Nevin noted that Plaintiff was well cheerful, well-groomed, and talkative. (*Id*. at 22). Plaintiff told Nevin that when angry or depressed she coped by "walking." (*Id*.). On February 23, 2016, Plaintiff was seen at Connections by nurse practitioner Chuck Chaney ("Chaney"), reported that her husband left her, and she was overwhelmed. (*Id*. at 30). Plaintiff was cooperative with normal speech; had goal directed and organized thought process; her mood was anxious and depressed; and she reported auditory hallucinations. (*Id*. at 33-34). Plaintiff's concentration was intact; her fund of knowledge and abstraction were adequate; and her insight and judgment were fair. (*Id*. at 34). Plaintiff was diagnosed with adjustment disorder with mixed anxiety and depressed mood and major depressive disorder, single episode, severe with psychotic features. (*Id*. at 41). She was prescribed Mirtazapine, Lamictal, and Risperdal. (*Id*.).

When Plaintiff returned for therapy on March 11, 2016, she stated that she was "feeling better in general." (*Id*. at 23). She reported issues with her housing situation and asked for a letter, stated that she was having positive communication with her family members, and eating and sleeping well. (*Id*.). She was encouraged to take her medication and do what works to keep her calm. (*Id*.).

Plaintiff was seen by Chaney on March 17, 2016 for a medication check. (*Id*. at 10). Her mood was normal and appropriate and her depression was controlled. (*Id*.). On April 15, 2016, Plaintiff told Chaney that she was "doing better" on medications and went for walks when she was

upset.  (*Id*. at 13).  Plaintiff's mood was normal and appropriate.  (*Id*.).  Assessment was depression controlled, anxiety and irritability exacerbated by stress, and no psychosis.  (*Id*.).  Plaintiff had "improved on meds."  (*Id*.).

On June 9, 2016, Plaintiff saw Chaney, stated she was "doing very well," and had "an employment opportunity" that she was very excited about.  (*Id*. at 16).  Plaintiff's mood was normal and appropriate, she was under less stress, and her depression and irritability were diminished.  (*Id*.).  Also on June 9, 2016, Plaintiff saw Nevin, reported that she was in need of stable housing, and Nevin noted the current diagnosis of major depressive disorder with psychotic features, single episode, and that Plaintiff exhibited psychomotor retardation or agitation.  (D.I. 10-8 at 56).  Nevin observed that Plaintiff was "well groomed with positive eye contact," denied suicidal/homicidal ideation, and reported eating and sleeping well.  (D.I. 10-9 at 26).

Plaintiff saw Nevin on September 22, 2016, and reported that her mood had been stable.  (*Id*. at 27).  Plaintiff had appropriate hygiene and eye contact.  (*Id*.).  When Plaintiff saw Nevin on September 29, 2016, Plaintiff's mood was stable and affect euthymic.  (*Id*. at 28).  On October 21, 2016, Plaintiff saw Chaney for a medication check and stated, "I am doing fine."[2]  (*Id*. at 19).  She was calm and appropriate and her mood appeared stable and euthymic.  (*Id*.).  Notes indicate that Plaintiff's depression and agitation were "under control."  (*Id*.).  Plaintiff was seen for therapy the same day, reported that she obtained housing for herself, and it was noted that Plaintiff was resourceful and able to care for herself.  (D.I. 10-8 at 54).  Upon examination, Plaintiff had appropriate hygiene and eye contact; stable mood and appropriate affect and

---

[2]     Dr. Downing's notes indicate that Plaintiff was hospitalized for psychiatric illness in the fall of 2016.  (D.I. 10-10 at 5).

organized thoughts and speech. (D.I. 10-9 at 29). Nevin reiterated Plaintiff's depressive disorder diagnosis and observed that Plaintiff displayed social withdrawal. (D.I. 10-8 at 53).

When Plaintiff saw Nevin on March 29, 2017, and she diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood and major depressive disorder, single episode, severe with psychotic features. (D.I. 10-9 at 7). Nevin wrote that acute situational events exacerbated Plaintiff's mood issues. (*Id.*). On June 16, 2017, Plaintiff presented to Connections and reported depression. (D.I. 10-9 at 66). Recovery plan noted that Plaintiff "continues to be in need of ongoing supportive therapy to assist her in establishing mood stability. She will address her depression by getting back on medication through a psychiatric evaluation" and her progress will be monitored. (*Id.*).

### c. Consultant

Plaintiff presented to Olga Yevsikova, M.D. ("Dr. Yevsikova") for a consultative examination on February 11, 2015. (D.I. 10-7 at 75). Plaintiff complained of low back pain rated at 7-10/10, right hand and wrist pain rated at 9/10, left ankle pain rated at 8/10, and headaches rated at 10/10. (*Id.*). She complained of left ankle and foot swelling but declined to take off her pants and boots. (*Id.* at 75, 78). Dr. Yevsikova examined the lower third of Plaintiff's legs; they were not swollen, and there was no edema. (*Id.* at 78). Upon examination, Plaintiff did not appear to be acute distress. (*Id.* at 77).

Dr. Yevsikova reported that Plaintiff came with a cane, prescribed by a doctor, and stated that she used it indoors and outdoors. (*Id.* at 77). Dr. Yevsikova saw Plaintiff in the corridor after the exam and she was limping much less and walking faster and, when he saw Plaintiff dropped a glove on the floor after her exam, she was able to stand on her left leg without support from a cane. (*Id.* at 77-78). Plaintiff could stand on her toes without support, but could not walk

on her toes.  (*Id.*).  Plaintiff did not need help changing for her exam or getting on and off the exam table, and could rise from her chair with some difficulty supporting herself.  (*Id.* at 77).  Straight leg exam was positive in the supine position but negative while sitting, Plaintiff had a reduced range of motion with 5/5 strength in the upper and lower extremities.  (*Id.* at 78).  Plaintiff's hand and finger dexterity were intact and her grip strength was 5/5 bilaterally.  (*Id.* at 79).  Dr. Yevsikova opined that Plaintiff had moderate exertional limitations and might have moderate schedule disruptions due to her condition exacerbations.  (*Id.* at 79).

### 5.    The Administrative Hearing

#### a.    Plaintiff's Testimony

Plaintiff's first hearing was held on July 7, 2017.  Plaintiff appeared without an attorney or representative.  The ALJ asked Plaintiff if she knew she had the right to an attorney or representative and whether she was planning on getting an attorney.  (D.I. 10-2 at 41).  Plaintiff answered, "yes" and the ALJ indicated the hearing would be postponed for two reasons:  (1) to have the case transferred to Wilmington for an in-person hearing; and (2) to give Plaintiff an opportunity to try to get an attorney.  (*Id.*).  The ALJ told Plaintiff that the "general rule is that claimants only get one postponement for an attorney" and advised Plaintiff that the next ALJ would likely go forward whether Plaintiff had an attorney or not.  (*Id.* at 41-42).  Before the first hearing ended, the ALJ asked Plaintiff where she had received treatment.  Plaintiff testified that she received pain management treatment at Christiana Hospital and Brandywine Medical Building, mental health treatment at Connections CSP, and treatment at Spine Pain Consultants.  (*Id.* at 42-44).

The second hearing was held on September 15, 2017 before the same ALJ.  After some preliminary discussion, the ALJ asked Plaintiff, "I guess I gave you an opportunity to get an

attorney last time, right?," and Plaintiff responded that she would not see an attorney until September 18, 2017. (*Id*. at 49). The ALJ indicated that the hearing would go forward and stated, "as I think I explained last time, we only give one postponement for . . . a claimant to find an attorney, so [] you can still get that attorney if . . . need be . . . that attorney can enter an appearance after the hearing or for whatever additional proceedings happen." (*Id*. at 50).

Next, the ALJ asked Plaintiff if she had received a CD with medical records from Social Security. (*Id*. at 51-52). Plaintiff replied that she had, but did not have access to a computer to look at the records. (*Id*.). The ALJ then stated, "Well, geez, that's . . . too bad because I like you to be able to see those records, clearly it's your right to see them." (*Id*.). The ALJ suggested that Plaintiff go the local hearing office to review the records. He advised Plaintiff to view the CD within the next 15 days and to contact him if there were any problems with any of the evidence on the CD. (*Id*. at 53-54).

The ALJ then elicited testimony from Plaintiff. She testified that she lived with her husband in Wilmington, Delaware. (*Id*. at 55). Plaintiff does not have a driver's license. (*Id*. at 56-67). Her husband cooks, does the laundry, and drives her when she needs to go out. (*Id*. at 63). Plaintiff completed the 11th grade in special education. (*Id*. at 56-57). Plaintiff can read a little bit and can write in English. (*Id*. at 57). She testified that sometimes she was able to understand the notices sent to her in the matter and, other times, someone had to read them to her. (*Id*.). Plaintiff had lived in New York and testified that she was not able to read the New York Post newspaper. (*Id*. at 58).

Plaintiff testified that she last worked in 2009 or 2010 performing security at a men's shelter. (*Id*.). In 2016, she had a temp job packing boxes, and worked there for four months

before she was let go due to medical issues. (*Id*. at 59). The temp job was five days a week, standing and packing boxes in a warehouse. (*Id*. at 60).

Plaintiff testified that her back, left leg, arthritis, anxiety, mood swings, and bipolar condition prevent her from working. (*Id*.). Plaintiff testified that she is unable to stand too long, and she cannot sit much because her back hurts. (*Id*. at 61). She testified she always has pain when she sits and the pain worsens with the weather. (*Id*.). Plaintiff testified that when she lived in New York it was hard for her to use public transportation, especially when she had pain. (*Id*. at 62-63). She testified she receives back injections at Spine Pain Clinic and also goes to Christiana Care Neurology. (*Id.* at 64-65). Plaintiff testified that when she moves around she has pain and feels better when she is lying down. (*Id*. at 63).

When asked how the anxiety and depression prevented her from working Plaintiff testified that because of the anxiety she does not like tight spots and does not like being around a lot of individuals. (*Id*. at 62). Plaintiff explained that when she moved from New York to Wilmington, Delaware, she received treatment at Connections, and is now on daily medicine to help with the anxiety. (*Id*.).

### b. Vocational Expert's Testimony

A VE testified at the administrative hearing. (*Id*. at 68-70). The ALJ asked the VE to assume an individual of Plaintiff's age and education, limited to sedentary jobs, who retains the ability to perform jobs at the sedentary level that allow the individual to sit or stand at will; can do occasional balancing, stooping, kneeling, crouching, and crawling; can understand, remember, and carry out simple routine tasks; and can use her judgment to make simple work-related decision – whether there any jobs such an individual could do in the national economy. (*Id*. at 68-69). The VE replied that the person could perform the jobs of order clerk food and beverage, call out

operator, and polisher eyeglass frames. (*Id*. at 69). The VE testified that the sit/stand option would not affect the numbers in those jobs. (*Id*.). He also testified that if the individual needed to miss at least two days of work per month, one hour of work per eight-hour day, or needed to be off task one hour per eight-hour day, there would be no jobs the individual could perform. (*Id*.).

## C. The ALJ's Findings

On November 7, 2017, the ALJ issued the following findings (D.I. 10-2 at 16-31):

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since September 20, 2012, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: lumbar radiculopathy; obesity; and major depression (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the ALJ found that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant must be allowed to sit or stand at her will; is unable to climb ladders or scaffolds; can occasionally climb ramps and stairs; can do occasional balancing, stooping, kneeling, crouching, and crawling; and the claimant can understand, remember, and carry out simple, routine and repetitive tasks; and can use her judgment to make simple, work-related decisions.[3]

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January 10, 1974 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged onset date (20 CFR 404.1563 and 416.963).

---

[3] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R, §§ 404.1567(a), 416.967(a).

8.    The claimant has a marginal education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from September 20, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g).

## II.    LEGAL STANDARDS

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.   *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).   A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must support its assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."   Fed. R. Civ. P. 56(c)(1)(A) & (B).   If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial."   *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).   The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Serv*., 409 F.3d 584, 594 (3d Cir. 2005) (stating that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## B. Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the evidence that was presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). Evidence that was not submitted to the ALJ can be considered, however, by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has made clear that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (*e.g.*, that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## III.   DISCUSSION

### A.   Disability Determination Process

A "disability" is defined for purposes of DIB and SSI as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   A claimant is disabled "only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Hess v. Commissioner of Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019).   If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity.  *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of nondisability when claimant is engaged in substantial gainful activity); *Hess*, 931 F.3d at 201.   If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe.  *Id.*   If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments

(20 C.F.R § 404.1520, Subpart P, Appendix 1) that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014). When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *Id.* If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Hess*, 931 F.3d at 201.

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his or her past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating that claimant is not disabled if claimant is able to return to past relevant work); *Zirnsak*, 777 F.3d at 611. A claimant's RFC "is the most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 404.1545(a)(1); *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. § 404.1545(a)(1)). "[T]he claimant always bears the burden of establishing (1) that she is severely impaired, and (2) either that the severe impairment meets or equals a listed impairment, or that it prevents her from performing her past work." *Zirnsak*, 777 F.3d at 611 (quoting *Wallace v. Secretary of Health & Human Servs*., 722 F.2d 1150, 1153 (3d Cir. 1983). If the claimant cannot perform her past relevant work, the ALJ moves on to step five. *Hess*, 931 F.3d at 202.

At step five, the ALJ examines whether the claimant "can make an adjustment to other work[,]" considering her "[RFC,] . . . age, education, and work experience[.]" 20 C.F.R. §§ 404.1520(a)(4)(v) and (g), 20 C.F.R. 416.920(a)(4)(v) and (g); *Hess*, 931 F.3d at 202. That examination typically involves "one or more hypothetical questions posed by the ALJ to [a] vocational expert." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). If the claimant

can make an adjustment to other work, she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot, she is disabled.

At this last step, ". . . the Commissioner bears the burden of establishing the existence of other available work that the claimant is capable of performing." *Zirnsak*, 777 F.3d at 612 (citing *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987)). In other words, the Commissioner ". . . is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [their] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). "'Ultimately, entitlement to benefits is dependent upon finding the claimant is incapable of performing work in the national economy.'" *Zirnsak*, 777 F.3d 612 (quoting *Provenzano v. Commissioner,* Civil No. 10-4460 (JBS), 2011 WL 3859917, at *1 (D.N.J. Aug. 31, 2011)).

When mental impairments are at issue, additional inquiries are layered on top of the basic five-step disability analysis and an ALJ assesses mental impairments. 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *Hess*, 931 F.3d at 202. As part of step two of the disability analysis, the ALJ decides whether the claimant has any "medically determinable mental impairment(s)." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1); *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (providing that, at step two, the ALJ determines whether the claimant has "a severe medically determinable physical or mental impairment"); *Hess*, 931 F.3d at 202. "[A]s part of that same step and also step three of the disability analysis, the ALJ determines 'the degree of functional limitation resulting from the impairment(s)[.]'" *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2) and citing 20 C.F.R. §§ 404.1520a(d), 416.920a(d), 404.1520(a)(4)(ii)-(iii), 416.920(a)(4)(ii)-(iii) (explaining that the ALJ uses "the degree of

functional limitation" in assessing "the severity of [the claimant's] mental impairment(s)[,]" which is considered at steps two and three)).

In determining the degree of functional limitation, the ALJ considers "four broad functional areas . . . :  Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); *Hess*, 931 F.3d at 202.  The first three areas are rated on a "five-point scale: None, mild, moderate, marked, and extreme."  20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4); *Hess*, 931 F.3d at 202.  The fourth is rated on a scale of: "None, one or two, three, four or more."  *Id*.

"The ALJ uses that degree rating in 'determin[ing] the severity of [the] mental impairment(s)[,]' which is considered at steps two and three."  *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. §§ 404.1520a(d), 416.920a(d) and citing 20 C.F.R. §§ 404.1520(a)(4)(ii)-(iii), 416.920(a)(4)(ii)-(iii) (stating that, at steps two and three, the ALJ "consider[s] the medical severity of [the claimant's] impairment(s)").  "If . . . the degree of [the claimant's] limitation in the first three functional areas [is] 'none' or 'mild' and 'none' in the fourth area, [the ALJ] will generally conclude that [the claimant's] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [his] ability to do basic work activities."  *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1) (citation omitted)).

"At step three, if the ALJ has found that a mental impairment is severe, he "then determine[s] if it meets or is equivalent in severity to a listed mental disorder."  *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2) and citing 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) (explaining that, at step three, the ALJ determines whether the claimant has "an impairment(s) that meets or equals" a listed impairment).  "That analysis is done 'by comparing the medical findings about [the claimant's] impairment(s) and the

rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder.'" *Hess*, 931 F.3d at 203 (quoting 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2)). As explained by the Third Circuit, "the claimant may have the equivalent of a listed impairment if, *inter alia*, he has at least two of '1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration[.]'" *Hess*, 931 F.3d at 203 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1).

"[T]o complete steps four and five of the disability analysis, if the ALJ has found that the claimant does not have a listed impairment or its equivalent, the ALJ 'will then assess [the claimant's mental RFC].'" *Hess*, 931 F.3d at 203 (quoting 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3) and citing 20 C.F.R. §§ 404.1520(a)(4)(iv)-(v), 416.920(a)(4)(iv)-(v) (providing that, at steps four and five, the ALJ considers the claimant's RFC)).

### B. Residual Functional Capacity Assessment

Plaintiff claims that she has a disability that qualifies her for Social Security benefits.[4] Defendant claims that substantial evidence supports the ALJ's finding that Plaintiff is not disabled. Defendant argues that the ALJ properly followed the five-step sequential analysis process outlined in the Social Security Regulations, the ALJ considered all the evidence, sought testimony from a VE, and relied upon that testimony in finding that Plaintiff is capable of performing a significant number of jobs in the national economy which constitutes substantial evidence of non-disability.

---

[4]     Plaintiff filed her Complaint *pro se*. Therefore, the Court must liberally construe her pleadings, and "apply the applicable law, irrespective of whether [s]he has mentioned it by name." *Holley v. Department of Veteran Affairs*, 165 F.3d 244, 247-48 (3d Cir. 1999); *see also Leventry v. Astrue*, Civ.A. No. 08-85J, 2009 WL 3045675 (W.D. Pa. Sept. 22, 2009) (applying same in the context of a social security appeal).

The final responsibility for determining a claimant's residual functional capacity is reserved to the Commissioner. *See Breen v. Commissioner of Soc. Sec.*, 504 F. App'x 96 (3d Cir. 2012) (citing 20 C.F.R § 404.1546(c)). In reviewing the ALJ's decision, the Court turns to the issue of whether the record supports the ALJ's residual functional capacity ("RFC") assessment. Plaintiff argues that she is always in pain that keeps her from doing activities, she provided all the documents supporting her claims, and her sciatica with arthritis on the lower back that affects the left side of her body and leg, and foot, make it hard for her to stand and walk and sit for too long. She also argues that her major depressive disorder with anxiety, bipolar disorder, mood swings, headaches, and sleep disorder qualify her for Social Security disability.

In his decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of September 20, 2012. The ALJ further found that the Plaintiff's lumbar radiculopathy, obesity, and major depression were severe impairments, but determined at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404 Subpt. P, App. 1 of the regulations. Despite her restrictions, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work except Plaintiff must be allowed to sit or stand at her will; is unable to climb ladders or scaffolds; can occasionally climb ramps and stairs; can do occasional balancing, stooping, kneeling, crouching, and crawling; can understand, remember, and carry out simple, routine and repetitive tasks; and can use her judgment to make simple, work-related decisions. At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing. The Court must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

"'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Commissioner of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. §§ 404.1545(a); 416.945(a). As noted, an individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121. This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001). The ALJ's RFC finding must "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Id.* (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).

The Court notes the absence in the administrative record of any opinion from an examining or non-examining source with respect to Plaintiff's mental functional limitations. "Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." *Gormont v. Astrue*, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013) (citing *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986)).

Because they are not treating medical professionals, ALJs cannot make medical conclusions in lieu of a physician:

> ALJs, as lay people, are not permitted to substitute their own opinions for opinions of physicians. This rule applies to observations about the claimant's mental as well as physical health. As the Seventh Circuit stated, "[J]udges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor." Accordingly, "[a]n ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own

unqualified opinion."   Nor is the ALJ allowed to "play doctor" by using her own lay opinions to fill evidentiary gaps in the record.

*Soto v. Colvin*, Civil Action No. 14-09 Erie, 2014 WL 4384501, at *7 (W.D. Pa. Sept. 4, 2014) (quoting Carolyn A. Kubitschek & Jon C. Dubin, *Social Security Disability Law and Procedure in Federal Courts*, § 6:24 (2013) (citations omitted)).   The United States Court of Appeals for the Third Circuit found remand appropriate when the ALJ's RFC finding was not supported by a medical assessment of any doctor in the record.   *See Doak*, 790 F.2d at 27-29 (directing remand because ALJ's conclusion that the claimant had the RFC to perform light work was not supported by substantial evidence in light of the fact that no physician in the record had suggested that the claimant could perform light work while others had reached different conclusions).   *See also Dumond v. Commissioner of Soc. Sec.*, 875 F. Supp. 2d 500, 109-10 (W.D. Pa. 2012) (rejecting Commissioner's argument that ALJ is not required to rely on a medical opinion in formulating a claimant's RFC); *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) ("An ALJ commits legal error when he makes a residual functional capacity determination base on medical reports that do not specifically explain the scope of claimant's work-related capabilities.").

In the instant case, a review of the ALJ's decision reveals that in the absence of an opinion from any source with respect to the Plaintiff's mental RFC, the ALJ reviewed the treatment note entries from Connections.   None of these treatment note entries, however, speak to Plaintiff's ability to work, and if so, under what conditions.   Seemingly, the ALJ relied solely on his lay analysis of these records.[5]   *See e.g.*, *Gunder v. Astrue*, No. 4:11-CV-00300, 2012 WL 511936 at *15 (M.D. Pa. 2012) ("Bare medical records without expert medical interpretation are rarely

---

[5]   One treatment note indicates that Plaintiff has an employment opportunity, but there is no discussion of the type of employment or whether Plaintiff has the ability to work and, if so, under what conditions.   (D.I. 10-9 at 16).

enough to establish a claimant's residual functional capacity."). The entries indicate that Plaintiff has social withdrawal and that anxiety and irritability were exacerbated by stress, but do not indicate how this might affect Plaintiff's ability to work.

In light of the foregoing, the Court finds that the ALJ's RFC assessment is not supported by substantial evidence. In turn, the hypothetical question to the VE is correspondingly defective.[6] For these reasons, the Court will remand the matter to the Commissioner for further consideration consistent with this Memorandum Opinion.

The ALJ is directed to reopen the record and allow the parties to be herd via submissions or otherwise as to the issues addressed in this Memorandum Opinion. *See Thomas v. Commissioner of Soc. Sec.*, 625 F.3d 800, 801 (3d Cir. 2010). Also upon remand, the ALJ must refer Plaintiff to an examining mental health specialist to determine any psychologically-based functional limitations, or consult a medical expert to review the entire record, add if necessary, reformulate Plaintiff's RFC and obtain additional VE testimony.

## IV. <u>CONCLUSION</u>

For the reasons, the Court will remand the case for further proceedings consistent with this Memorandum Opinion. Plaintiff's motion for summary judgment (D.I. 20) will be granted and Defendant's cross-motion for summary judgment (D.I. 21) will be denied.

A separate order will be entered.

---

[6] Given the Third Circuit's mandate to include everything in a hypothetical based upon relevant physical and mental RFC's remand for this reason is also appropriate. *See e.g*., *Chrupcala v. Hecklery*, 829 F.2d 1269, 1276 (3d Cir. 1987).